IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PUSHPEEL LLC,

Plaintiff,

v.

SCHEDULE A DEFENDANTS,

Defendants.

Case No. 26-cv-1427

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Pushpeel LLC ("Pushpeel" or "Plaintiff") hereby sues Defendants, the Individuals, Partnerships, and Unincorporated Associations identified on Schedule "A" (collectively "Defendants").  All Defendants have infringed, and continue to infringe, one or more of the claims of Plaintiff's United States Patent No. 12,478,892 ("the '892 patent") by manufacturing, importing, offering for sale, and/or selling infringing sensorial activity toys (the "Infringing Products") on the Amazon.com online marketplace, operating under the seller identities and/or the online marketplace accounts as set forth on **Schedule "A"** hereto (the "Seller IDs" and collectively, the "Defendant Merchant Storefronts"). In support of its claims, Plaintiff alleges as follows:

## NATURE OF ACTION

1.      Plaintiff sells a fidget toy for calming, stress, anxiety, attention-deficit/hyperactivity disorder, and autism.  An example of Plaintiff's product appears below:

1



Plaintiff's product provides a screen-free, tactile experience with silicone strings on a surface, allowing users to push, peel, loop, and create patterns to relieve stress, improve focus, and develop fine motor skills, hand-eye coordination, and problem-solving. Plaintiff primarily sells its product through the Amazon.com online marketplace.

2.    Plaintiff is the owner of the '892 patent, one or more of the claims of which are infringed by Defendants. Below is a side-by-side comparison of figures of the '892 patent showing different embodiments and examples of Defendants' products that infringe:

| Figure No. | Figure | Example of Defendants' Product |
|---|---|---|
| Fig. 1A | | *Type 1* |

| Figure No. | Figure | Example of Defendants' Product |
|---|---|---|
| Fig. 6 | | *Type 2* |
| Fig. 7 | | *Type 3* |
| Fig. 5 | | *Type 4* |



**JURISDICTION AND VENUE**

3.      The Infringing Products are substantially identical to each other and the same in all respects to infringement of the '892 patent.

4.      This Court has original subject-matter jurisdiction over the claims in this action pursuant to the provisions of the Federal Patent Act, 15 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

5.      Personal jurisdiction over each Defendant satisfies constitutional due process because, upon information and belief, each Defendant has sold products that infringe Plaintiff's '892 patent to consumers within Pennsylvania not affiliated in any way with Plaintiff through the regular course of business, with the knowledge that Plaintiff is harmed in Pennsylvania as a result of its sales of infringing products to Pennsylvania residents.  In addition, each Defendant has been willing to accept an order for a product that infringes Plaintiff's '892 patent from a representative of Plaintiff with a Pennsylvania address, to ship the product to that representative in Pennsylvania, and to collect Pennsylvania sales tax. Plaintiff's claims arise out of and relate to Defendants' offers to sell and sales of products that infringe Plaintiff's '892 patent to Pennsylvania residents through the regular course of business.

6.      Personal jurisdiction over each Defendant also satisfies constitutional due process because the causes of action asserted herein, including patent infringement, are intentional torts, were aimed at Pennsylvania, and caused harm that each Defendant should have anticipated would be suffered by Plaintiff in Pennsylvania.

7.      Personal jurisdiction over each Defendant satisfies the Pennsylvania long-arm statute, and therefore Rule 4(k)(1)(A) of the Federal Rules of Civil procedure.  The Pennsylvania long-arm statute provides for jurisdiction "to the fullest extent allowed under the Constitution of

the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). The Pennsylvania long-arm statute is, therefore, coextensive with the Due Process Clause.

8.      Upon information and belief, Defendants have cooperated, communicated, shared information, and coordinated their efforts in order to create an infringing marketplace operating in parallel to the legitimate marketplace of Plaintiff and third parties authorized to sell products embodying Plaintiff's patented invention, including employing and benefitting from substantially similar paid advertising, marketing, and advertising strategies (*e.g.*, search engine optimization or "SEO"), in order to make their online storefronts appear more relevant and target a consumer searching for products embodying Plaintiff's patented invention. By their actions, in addition to the damages associated with unauthorized use of Plaintiff's patent invention, Defendants are causing concurrent and irreparable harm to Plaintiff and the consuming public by: (1) reducing the online visibility of Plaintiff's patented invention; (2) diluting and eroding the retail market price for Plaintiff's patented invention; (3) causing overall degradation of the value of goodwill associated with Plaintiff's patented invention; (4) devaluing the exclusivity that enhances the worth of Plaintiff's patented invention and Plaintiff's reputation; and (5) increasing Plaintiff's overall cost to market its goods and educate consumers about Plaintiff's patented invention.

9.      Upon information and belief, Defendants are aware of Plaintiff and Plaintiff's patent and are aware that their infringement is likely to cause harm to Plaintiff in Pennsylvania.

10.      Plaintiff is suffering irreparable and indivisible injury and has suffered substantial damages as a result of Defendants' unauthorized sale of the Infringing Products in direct competition with Plaintiff.

11. By virtue of the civil conspiracy claim in Count II of this Complaint, the Pennsylvania contacts of each Defendant are imputed to every other Defendant because, upon information and belief, each Defendant was aware of, or should have been aware of, the actions of the other co-conspirators.

12. By virtue of the civil conspiracy claim in Count II of this Complaint and the allegations of coordinated actions by Defendants, Plaintiff's claims against Defendants arise out of the same series of transactions and occurrences.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3). Defendants do not reside in the United States and are subject to venue in any district. Further, Defendants solicit business from this Judicial District and, upon information and belief, conduct and transact significant business in this Judicial District.

## INTRODUCTION

14. Plaintiff is the owner of the '892 patent that protects Plaintiff's patented invention. Sayer Murphy, the owner of Plaintiff, invented, designed, developed, marketed, and sold the first toy marketed as a sensory activity board. Indeed, Mr. Murphy coined the term "sensory activity board." Mr. Murphy is the named inventor on the '892 patent.

15. Plaintiff filed this action to combat online infringers who trade upon Plaintiff's reputation, goodwill, and valuable patent by selling and/or offering for sale products infringing Plaintiff's patented invention. In addition, Defendants are selling unauthorized products that are based on and derived from the patented invention of the '892 patent.

16. The '892 patent was issued on November 25, 2025 and is valid, subsisting, and in full force and effect. A true and correct copy of the '892 patent is attached hereto as **Exhibit 1**.

17.     In an effort to illegally profit from the creative content of Plaintiff's invention, Defendants have created numerous Defendant Merchant Storefronts and designed them to appear to be selling products that are authorized by Plaintiff.

18.     The Defendant Merchant Storefronts share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal operation. Plaintiff is forced to file this action to combat Defendants' piracy of Plaintiff's invention. Plaintiff has suffered, and continues to suffer, irreparable harm due to the loss of control over the quality and creative content of Plaintiff's valuable patented invention, as well as damage to Plaintiff's reputation, goodwill, and ability to license as a result of Defendants' actions. Accordingly, Plaintiff seeks injunctive and monetary relief.

19.     The rise of online retailing, coupled with the ability of sellers on e-commerce sites to hide their identities, has made it nearly impossible for Plaintiff to undertake non-litigation policing actions because taking advantage of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass piracy that is occurring over the internet. The aggregated effect of the mass piracy that is taking place has overwhelmed Plaintiff and Plaintiff's ability to police Plaintiff's rights against the dozens of anonymous defendants who are selling illegal infringing products at prices well below an original.

20.     To be able to offer the infringing products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, infringers act

7

in concert through coordinated supply chains and distribution networks to unfairly compete with

legitimate brand owners while generating huge profits for the illegal pirating network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks. **The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.**
> . . .
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.
> . . .
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*,

Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-

goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

21.    The Defendant Merchant Storefronts share unique identifiers, such as design

elements and similarities of the unauthorized products offered for sale, establishing a logical

relationship between them and suggesting that Defendants' illegal operations arise out of the same

transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid

liability by going to great lengths to conceal both their identities as well as the full scope and

interworking of their illegal network. Despite deterrents such as takedowns and other measures, the

use of aliases enables infringers to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
> . . .
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
> . . .
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

22.    Plaintiff has been and continues to be irreparably harmed through the loss of

control over Plaintiff's reputation, goodwill, ability to license, and the quality of goods featuring

the Plaintiff's invention, as well as the devaluation of the exclusivity associated with Plaintiff's

invention and professional reputation. The rise of eCommerce as a method of supplying goods to

the public exposes brand holders and content creators that make significant investments in their

products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organization for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S.

Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.
. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
. . .
Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2)** at 4, 8,

11.

23. Not only are the creators and patent owners harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e- commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers. The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

**THE PLAINTIFF**

24.     Plaintiff has expended substantial time, money, and other resources developing, advertising, and otherwise promoting Plaintiff's invention. Plaintiff has also invested substantial time, money, and effort in building up and developing consumer awareness, goodwill, and recognition in the Plaintiff's invention. As a result, reproductions associated with Plaintiff are recognized and exclusively associated by consumers, collectors, the public, and the trade as authorized by Plaintiff.

25.     The success of the Plaintiff's invention is due in large part to Plaintiff's marketing, promotional, and distribution efforts.

26.     As a result of Plaintiff's efforts, the quality of Plaintiff's products, the promotional efforts for Plaintiff's products and designs, press and media coverage, and social media coverage, members of the public have become familiar with the Plaintiff's invention and associate Plaintiff's invention exclusively with Plaintiff.

27.     Plaintiff has made efforts to protect Plaintiff's interests in and to Plaintiff's invention. No one other than Plaintiff and Plaintiff's licensees are authorized to manufacture, import, export, advertise, create derivative works, offer for sale, or sell any goods embodying Plaintiff's invention without the express written permission of Plaintiff or Plaintiff's representative.

28.     Plaintiff is engaged in the business of distributing a variety of products throughout the world, including within Pennsylvania.  Plaintiff, either directly or indirectly, offers for sale and sells Plaintiff's products within the Commonwealth of Pennsylvania, including via the Internet on https://www.amazon.com.  Defendants, through the advertising, offering for sale, and sale of infringing versions of Plaintiff's invention are directly and unfairly competing with

11

Plaintiff's economic interests in the Commonwealth of Pennsylvania and causing Plaintiff irreparable harm and damage within this jurisdiction.

29.    Plaintiff suffers ongoing daily and sustained violations of Plaintiff's '892 patent at the hands of infringers such as Defendants who wrongfully offer for sale, reproduce, and infringe Plaintiff's patented invention. The natural and intended byproduct of Defendants' combined actions is the erosion and destruction of the goodwill associated with Plaintiff's name in Pennsylvania and brand and the destruction of the legitimate market sector in Pennsylvania in which Plaintiff operates. Defendants' marketing and sales of their infringing products in Pennsylvania directly and adversely affects Plaintiff's sales and profits in Pennsylvania.

## THE DEFENDANTS

30.    Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions or distribute goods from foreign jurisdictions. Defendants conduct business throughout the United States, including within Pennsylvania and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Merchant Storefronts. Each Defendant targets the United States, including Pennsylvania, and has offered to sell and, on information and belief, has sold and continues to sell illegal reproductions of the Plaintiff's Works to consumers within the United States, including Pennsylvania and in this judicial district.

31.    Defendants directly engage in infringing one or more of the claims of Plaintiff's '892 patent by advertising, offering for sale, and/or selling goods to consumers within Pennsylvania through e-commerce stores using, at least, the Defendant Merchant Storefronts, as well as additional ecommerce store or seller identification aliases not yet known to Plaintiff. Defendants have purposefully directed some portion of their unlawful activities toward consumers

in the Commonwealth of Pennsylvania through the advertisement, offer to sell, sale, and/or shipment of infringing versions of patented invention into Pennsylvania.

32.     Defendants are using Plaintiff's patented invention to drive Internet consumer traffic to their e-commerce stores operating under the Defendant Merchant Storefronts, thereby decreasing the size and value of Plaintiff's legitimate Pennsylvania marketplace and intellectual property rights.

## THE DEFENDANTS' UNLAWFUL CONDUCT

33.     The success of the Plaintiff's patented invention has resulted in significant copying of the creative content protected by Plaintiff's '892 patent.  Plaintiff has identified numerous fully interactive marketplace listings for infringement of one or more claims of Plaintiff's '892 patent on Amazon.

34.      Upon information and belief, Defendants facilitate sales by designing the Defendant Merchant Storefronts so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine versions of Plaintiff's patented invention.

35.     The Defendant Merchant Storefronts intentionally conceal their identities and the full scope of their piracy operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal operations. Through their operation of the Defendant Merchant Storefronts, Defendants are directly and personally contributing to, inducing, and engaging in the sale of Infringing Products as alleged, often times as partners, co-conspirators, and/or suppliers. Upon information and belief, Defendants are an interrelated group of infringers working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Infringing Products.

36.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the '892 patent, including Plaintiff's exclusive right to use and license such intellectual property and the goodwill associated therewith.

37.     Infringers often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Merchant Storefronts. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on Amazon and other online marketplaces using the identities listed in Schedule A to the Complaint as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities and the full scope and interworking of their massive pirating operations and to avoid being shut down.

38.     The Infringing Products for sale in the Defendant Merchant Storefronts bear similarities and indicia of being related to one another, suggesting that the Infringing Products were manufactured by and come from a common source and that, upon information and belief, Defendants are coordinating and working in concert to profit from Plaintiff's protected intellectual property.

39.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online infringers use a variety of other common tactics to evade enforcement efforts. For example, infringers like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Infringers also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure

14

statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as **Exhibit 3**. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. *Id.* Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. *Id.* at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." *Id.* at 23.

40.    Further, Infringers such as Defendants typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain offshore bank accounts and regularly move funds from their PayPal accounts to offshore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore infringers regularly move funds from U.S.-based PayPal accounts to foreign-based bank accounts, such as China-based bank accounts, outside the jurisdiction of this Court.

## COUNT I
## DIRECT PATENT INFRINGEMENT

41.    Plaintiff repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

42.    Each Defendant has directly infringed, and continues to infringing, at least independent claim 1 of the '892 patent.  (See **Exhibit 4**, claim charts comparing the text of Claim 1 of the '892 patent to each of the Infringing Products).

43.    Defendants' Infringing Products are toys.

44.    Defendants' Infringing Products comprise a platform defined by at least a surface, a first channel, and a second channel not rectilinearly parallel to the first channel, each of the first channel and the second channel including a first sidewall of a first protrusion extending from the surface and a second sidewall of a second protrusion extending from the surface, wherein optionally the first protrusion or the second protrusion of the first channel corresponds to one of the first protrusion or the second protrusion of the second channel.

45.    Defendants' Infringing Products comprise a discrete flexible member being cylindrical along at least a partial length thereof and having a thickness such that a bulk of the discrete flexible member is releasably securable along the partial length thereof within the first channel or the second channel such that at least a portion of the discrete flexible member is curvilinear, wherein the discrete flexible member has a cross-sectional profile having a circumdiameter less than a length of the discrete flexible member.

46.    Pursuant to 35 U.S.C. § 287, Plaintiff has complied with the marking provisions of the Patent Act.

47.    Plaintiff is entitled to recover damages adequate to compensate it for such infringement but in no event less than a reasonable royalty for Defendants' infringement of the '892 patent, together with interest and costs.

48.    The patent application that matured into the '892 patent was published as U.S. Patent Application Publication No. 20250288918 on October 19, 2025.

16

49.     Each Defendants had actual notice of U.S. Patent Application Publication No. 20250288918.

50.     The claims of U.S. Patent Application Publication No. 20250288918 and the '892 patent are substantially identical.

51.     The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiff.

52.     As a result of each Defendant's infringement of Plaintiff's exclusive rights, Plaintiff is entitled to relief pursuant to 15 U.S.C. § 284, including enhanced damages, and to Plaintiff's attorneys' fees and costs pursuant to 15 U.S.C. § 285.

53.     The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 15 U.S.C. § 283, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's '892 patent and specifically enjoining further importation, offer for sale, and sale of Infringing Products in the United States.

**COUNT II**
**CIVIL CONSPIRACY**

54.     Plaintiff repeats and adopts and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

55.     Plaintiff is informed and believes and therefore alleges upon information and belief that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, a concerted and

17

collaborated effort to maintain the distribution, marketing, advertising, shipping, and sale of products that infringe at least one claim of Plaintiff's '892 patent.

56.     The intent, purpose, and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to unfairly compete against Plaintiff and to profit from Plaintiff's intellectual property.

57.     Each Defendant understood and accepted the foregoing scheme and agreed to do its respective part to further accomplish the foregoing intent, purpose, and objective.  Thus, by entering into the conspiracy, each Defendant has deliberately, willfully, and maliciously permitted, encouraged, and induced all of the foregoing unlawful acts and misconduct.

58.     As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, Plaintiff has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate, and irreparable harm, damage, and injury for which Plaintiff has no adequate remedy at law.

59.     As a result of Defendants' actions alleged herein, Plaintiff is entitled to injunctive relief, an order granting Plaintiff's damages and disgorging Defendants' profits stemming from their false advertisements, and exemplary or punitive damages for Defendants' intentional misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)  That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a.  promoting, advertising, distributing, having manufactured, importing, offering for sale, and selling Defendants' Infringing Products; and

b.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Merchant Storefronts, or any other online marketplace account that is being used to sell products or inventory not authorized by Plaintiff which infringe at least one claim of Plaintiff's '892 patent.

2)  Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces, social media platforms, Facebook, YouTube, LinkedIn, Twitter, internet search engines such as Google, Bing, and Yahoo, web hosts for the Defendant Merchant Storefronts, shall:

a.  disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiff which infringe at least one claim of Plaintiff's '892 patent, including any accounts associated with the Defendants listed on Schedule A;

b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products that infringe at least one claim of Plaintiff's '892 patent; and

c.  take all steps necessary to prevent links to the Defendant accounts identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant accounts from any search index;

3)  For judgment in favor of Plaintiff against Defendants declaring that they have: a) willfully infringed Plaintiff's rights in the claims of the '892 patent; and b) otherwise injured the

19

business reputation and business of Plaintiff by Defendants' acts and conduct set forth in this Complaint;

4) For judgment in favor of Plaintiff against Defendants for actual damages and enhanced damages in an amount to be determined at trial, together with interests and costs as fixed by the Court;

5) That Plaintiff be awarded Plaintiff's reasonable attorneys' fees and costs;

6) That Plaintiff be awarded punitive damages; and

7) Award any and all other relief that this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all claims.

Respectfully submitted,

Dated: July 1, 2026

/s/ Stanley D. Ference III
Stanley D. Ference III
Pa. ID No. 59899
courts@ferencelaw.com

FERENCE & ASSOCIATES LLC
409 Broad Street
Pittsburgh, Pennsylvania 15143
(412) 741-8400 – Telephone
(412) 741-9292 – Facsimile

Attorneys for Plaintiff

## LIST OF EXHIBITS

Exhibit 1    Registration certificates for the Plaintiff's Works

Exhibit 2    Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020 (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods)

Exhibit 3    U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf)

Exhibit 4    Claim Charts

## Schedule "A"

## Defendants with Store Name and Seller ID

**[This page is the subject of Plaintiff's Motion to File Under Seal. As such, this page has been redacted in accordance with L.R. 5.4(b)(1)]**